ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY V. MEESE
ET AL.

DAMAGES: *From obstruction to navigation: Bridge.*

It is the duty of the owners of a bridge across a navigable stream to use reasonable diligence to prevent such accumulation of drifts about the bridge piers, either above or below the surface of the water, as might endanger navigation; and for failure to use such diligence they will be liable for damages resulting from such obstructions to crafts navigating the river, unless there was contributory negligence in the careless and unskillful piloting of the craft.

APPEAL from *Pulaski* Circuit Court.
Hon. F. T. VAUGHAN, Circuit Judge.

*Dodge & Johnson* for appellant.

The conclusions to be drawn from the evidence are:

*First*—That the raft was coming through the opening in the bridge in a quartering position, the most dangerous position it could assume for the purpose of passing through a narrow space.

*Second*—That it struck upon *an invisible* obstruction, which witness did not see, and which, to use his own words, *"could not be seen."*

*Third*—That the raft, after striking this invisible obstruction, swung around and struck the drift and broke off *two or three* pieces of it.

*Fourth*—That in this condition the remainder of the raft, still remaining solidly fastened together, passed below the water works, where the witness, Brown, got on and tied the rope to it, and then fastened it to the shore.

*Fifth*—That then the raft again struck some driftwood, and the rope broke.

*Sixth*—That it passed on without *any* further effort being made to land it.

*Seventh*—And after passing the city landing, and when opposite the oil mill, just at the lower end of the city, "night coming on, they abandoned it and let it go."

It was contended on the trial, and is now earnestly contended here, that the evidence disclosed the patent facts, each of which entitles this defendant to a verdict, and, failing to secure that at the hands of the jury, entitles it to a new trial.

It was contended, *first*, that there could be no liability on account of negligence or unskillfulness in the construction of the bridge, because it was admitted that it was

St. Louis, Iron Mountain & Southern Railway v. Meese et al.

a legal structure, skillfully constructed in strict compliance with the law and the requirements of the Secretary of War, and this was conceded by counsel for plaintiffs on the trial.

*Second*—That it was not the duty of defendant to keep driftwood from lodging against the structure, the bridge having been built in a skillful and proper manner, and that it had not been negligent or careless in the premises.

*Third*—That even if defendant had been guilty of negligence, the loss, if any, had been occasioned by the carelessness of plaintiffs contributing thereto.

There then being no negligence claimed because of the fact of the driftwood lodging against the breakwater and crib, and the defendant having done its duty in endeavoring to remove the same just as soon as discovered, and failing because it was an impossibility, there was in law no liability and the verdict cannot stand.

The third instruction asked by defendant should have been given. It certainly was not the duty of defendant to guard against *unknown* and *invisible* obstructions.

*W. F. Hill* for appellee.

The verdict is sustained by the evidence, and is not excessive.

The third instruction refused is not law. It should have stated that it was the duty of the defendant's servants to use reasonable diligence to discover the danger from driftwood, and either prevent its accumulation or remove it with due diligence. See 33 Ark., 350, and particularly instructions 9, 10 and 12 on pp. 273, 275.

EAKIN, J. The appellants are lessees of the Baring Cross bridge, over the Arkansas River just above Little Rock. It is a well constructed bridge, built under authority of

Congress, having a draw for steamers and supported upon piers, with ample space between them for free navigation by any sort of water craft.

The appellees were the owners of a raft of logs which they were floating down the river for sale at Little Rock. It was during or just after a considerable rise in the river, which occurred in the month of February, 1882. Some driftwood had accumulated against the breakwater which protected the pier of the bridge which supported the draw, and more below the pillar, between that and the crib still below. In attempting to run their raft between this pier and the shore, it was caught near the upper end by a log, under water, which had been lodged against the breakwater. The raft swung around with its lower end amongst the driftwood below the pier. Two or three of the oars were broken, and parts of the raft became detached. The main body of the raft, however, swung clear and went through, but slightly damaged and holding together. The employes upon the raft endeavored to land it at its destination, that being a saw-mill a short distance below the bridge, but failed to get it into shore. They sent out a rope, which was fastened to the shore. That broke, and the raft passed on down to the lower part of the town, beyond any point at which it could be sold. It was then abandoned as without market value, and the owners sued the bridge lessees for damages, alleging that they were negligent in allowing the driftwood so to accumulate about the breakwater and pier as to endanger navigation.

The company denied negligence on its part, and charged contributory negligence and unskillful navigation of the raft as the cause of the injury. Upon the trial, by a jury, the court charged generally on behalf of the plaintiffs, no

27

special written instructions being asked. We must presume that the instructions were in accordance with law.

The instructions asked by the defendant company, and given in its behalf, were as favorable as it could have desired. Their purport was, that the jury must find for defendant if they believed that there was sufficient space between the breakwater, pier and crib on one side, and the shore on the other, for the raft to have passed by the exercise of care and skill on the part of those in charge; or—

Second. If they believe from the evidence, that the men in charge, through excitement or want of skill in steering, ran closer to the breakwater, pier and crib than was prudent under the circumstances, and thereby struck the logs and driftwood, causing the loss; or—

Third. If they believed that the raft was lost by running against obstructions above or below the pier, through want of care and skill on the part of the plaintiffs, or through unavoidable accident, or the action of the current of the river; or—

Fourth. If they believed that the river, at the time, was very high, with large quantities of timber, logs and drift floating upon it; and that the defendant company used reasonable efforts to keep the bridge clear of the same, but was unable by ordinary diligence to do so; or—

Fifth. If the drift was visible, and there was sufficient space between it and the shore for those in charge to have avoided it by the exercise of reasonable caution, prudence and skill; or—

Lastly, if they believed that the logs between the pier and the crib had been lodged there during the rise of the then high water, and by reason of the then high water could not be removed.

The third instruction asked by defendants the court de-

clined to give. It was as follows: "If the jury believe the raft was lost by reason of striking logs above or below the pier, and under the water, so that they could not be seen, and that defendant's servants in charge of the bridge did not know that said logs were so lodged, or have reason to suspect their presence, they will find for the defendant." The refusal of this is made one of the grounds of a motion for a new trial.

As the case is presented by the evidence, and in view of the favorable instructions given for defendant, it is not apparent that there was error in refusing this. It was certainly the duty of the bridge company to take reasonable care to prevent such accumulations of drift about their piers, either above or below the surface of the water, as might endanger navigation. This duty was, perhaps, the more imperative in the case of submerged drift, inasmuch as being hidden from navigators, it was so much more dangerous and treacherous. At the same time it would be more easily discoverable by the keepers of the bridge than by strangers coming down with rafts. It is true that the company ought not still to be liable for hidden drift which it could not, by reasonable care and watchfulness, have discovered at all. But it was not excusable for want of active watchfulness against so probable a danger, and which, in its nature, was so easily discoverable by those on the spot. Besides, the evidence does not show that the employes in charge of the bridge were ignorant of the existence of the log which caused the injury.

*Damages from obstruction to navigation.*

This is a case depending on the evidence, the real questions in issue being these: Was the proof sufficient to show negligence on the part of defendant; and if there was such negligence was there failure of proof of such carelessness or want of skill on the part of plaintiffs, conducing to the damage, as would deprive them of relief?

It was necessary to such a verdict as was rendered that negligence of the company should be shown, and no want of due care and skill in management on the part of plaintiffs. Upon either point it is not necessary that the evidence should be conclusive. If there be any substantial evidence of negligence, or a conflict of evidence upon either side as to negligence, then, according to the rules of this court, the verdict must stand.

Taking up, first, the evidence of plaintiffs. Besides the facts above stated, it tends to show that the raft was well built, and under charge of a good pilot; that the projecting log at the breakwater was invisible, and caught *under* the raft. It was the cause of breaking and crippling the raft to such an extent as to prevent the landing below, thus being the proximate cause of the damage. There was, below the pier, a pile of driftwood rising four or five feet above the surface, with logs extending from it fifteen or twenty feet towards the bank. This drift combined with the log at the breakwater to damage the raft. The raft itself was eighteen feet wide and over one hundred feet long, being about the ordinary size. The width of the channel between the pier and bank was about one hundred feet. Men were engaged next day in cutting out the drift and making it into cord-wood.

Upon the point of negligence of defendant, this might well be considered by the jury as making a *prima facie* case, throwing upon defendant the onus of showing that these dangerous impediments had been deposited and continued there without fault of defendant, and that it had not failed in watchfulness to prevent it, or in reasonable efforts to remove it. It was certainly the duty of the company so to exercise its franchises and privileges that its piers should not be allowed to become nuisances in the way of navigation.

St. Louis, Iron Mountain & Southern Railway v. Meese et al.

On the part of the defendant the evidence tends to show in exculpation that there was a clear space for boats of one hundred and sixty feet between the pier and the shore; that the drift did not extend into it over six or eight feet. It shows that, generally, efforts were made to keep the driftwood off, and take it away, but that it could only be done by chopping out, and that could not be done before the fall of the water. It was badly tangled up and fastened together. The drift was removed as soon as it possibly could have been. It never stays long on the breakwater, but usually drifts away. The drift below the pier takes a long while to remove, and that was done as soon as possible.

If, upon the evidence, this jury had rendered a verdict for defendant it would have been well supported. But they found for plaintiffs, and the question is, whether it was so much against evidence as to demand a new trial.

It will be found that the principal witness for the company, as to the facts, is vague and general as to matters in which he might be expected to be specific. For instance, Tim Keller, who had charge of the bridge at the time, whose duty it was to know all about the matter, uses such general phrases as this: "We used every effort to keep the logs from lodging against the breakwater," but not a single effort is detailed as to time, means employed, or any other circumstance. Efforts and means are active, visible things, and if used are apt to be mentioned by those who are charged with having neglected them. No explanation is made of the submerged log, which proved so disastrous, or of any efforts to get that away, nor is it shown how or when it was lodged there; nor is it shown that the employes of the bridge were ignorant of its existence. Again he says: "We tried every means in our power to get the driftwood away from between the draw-pier and

the crib. We tried to pull it loose by hitching a strong cable to a locomotive. We broke a three inch cable twice in trying to pull the drift apart, and were unsuccessful. The only way the drift could be removed was by chopping it out with axes, and this could not be done until the river fell sufficiently to get at the drift. Offered men as high as ten dollars a day to get it away while the water was high, but could not get it done." All these things are given without dates, or any mode of fixing the time. When asked, on cross-examination, when it was he had the locomotive at work, said he did not recollect. The breaking up of the raft was certainly an event of some note to the habitues and employes of the bridge, and he might certainly have had some idea as to whether the work he spoke of was before that or after that, or about that time. Generalities, used by those who ought to speak particularly, are of little worth as evidence in cases of conflict and doubt. Another bridge employe says "the drift was removed as soon as it possibly could have been," without stating when or how. Upon the other hand, there was evidence that the drift had been there from two weeks to a month, and that it was accessible, being above the water; and that next day people were working at it and removing it in boats for cordwood. It is not beyond the province of a jury to say that it is dissatisfied with this evidence, and to conclude that defendant had not satisfactorily shown due care.

The jury must also have found that there was no contributory negligence on the part of those managing the raft. Upon that point the tenor and effect of the evidence is about this: That very expert raftsmen, knowing the dangers, might have run the raft through without injury. The men engaged in steering this one were under a fair pilot, who had run the raft so far down from Perry County

with success, and were about to run this passage with success, and would have done so but for striking on the unseen obstacle, which hung the raft and swung it around.

There is some evidence that when the accident happened they became scared and demoralized, but not enough evidence to show they neglected any such precautions to prevent or remedy the consequences as they were required to take. They had no premonition of the danger. The submerged log could not be seen at all, and the drift below the pier could not be seen in time to guard so unwieldy a body as a raft in strong water, from danger of coming in contact.

Whilst there might be some doubt in our minds of the negligence in the company as to the matter of drift, we must regard the verdict of the jury, and the opinion of the circuit judge in denying a new trial. The verdict cannot be said to be without evidence or against evidence, and it cannot, therefore, be held here that there was error in denying a new trial.

Affirm.