LOUISVILLE & NASHVILLE RAILROAD COMPANY, A COR-
PORATION, *Plaintiff in Error*, v. W. G. YARBROUGH,
*Defendant in Error.*

1.  The floatage of logs in a navigable river must be carried on
    with due and reasonable regard to the rights of a bridge owner,
    and others, and to the general usages and customs of navigation
    and commerce.

2.  While a railroad is not required to keep the open space under
    its drawbridges over a navigable stream free from obstructions
    to navigation when such obstructions are present without fault
    on the part of the railroad, yet it is the duty of a railroad com-
    pany to prevent the accumulation of wreckage or drift around
    the piers of its bridges which would interfere with navigation.

3.  Where a raft has lodged against the fender of the pier of a
    railroad drawbridge on an important line of railroad about 9
    o'clock at night, there being a navigable channel sufficiently
    wide to easily permit the passage of boats and rafts on either
    side of the pier, and the raft remained there until three
    o'clock the next evening, and when the agent of the owner of
    the raft in charge thereof has made no proper efforts to remove
    the raft, or to notify the owner of its situation, the river be-
    ing in a rising condition, and the raft being a menace to the
    bridge, and a nuisance which the railroad company has the
    right to remove for its own protection and the protection of the
    lives and property of those who had occasion to use the rail-
    road, and the railroad officials had endeavored without avail
    to pull the raft away from the pier, and then cut up the raft
    about three o'clock the next day after it lodged, and part of
    the logs were lost, and a suit was brought by the owner of the
    logs to recover of the railroad company the value of the lost
    logs, on the trial of said suit it was erroneous to charge the
    jury "the duty upon the railroad before it broke up the raft
    to notify the owner or his agents of their intention so to do,
    and to allow him a reasonable time and opportunity to take care
    of the raft after it was turned loose." Such a charge was inap-
    propriate to the facts. In removing the raft it was the duty of
    the railroad company to use ordinary care to do no unneces-
    sary injury to the owner of the raft, but under the circum-

stances neither the owner or his agent had a right to any other notice than they had of the exigencies of the situation.

4. No question is presented here of the applicability to the facts of section 3149 General Statutes of 1906.

This case was decided by Division B.

Writ of Error to the Circuit Court for Jackson County.

The facts in the case are stated in the opinion of the court.

*Liddon & Carter,* for Plaintiff in Error;

*Price & Lewis,* for Defendant in Error.

HOCKER, J.—W. G. Yarbrough sued the Louisville & Nashville Railroad Company in the Circuit Court of Jackson County. The following is the declaration and bill of particulars, the latter being made a part of the former:

"Now comes the plaintiff in the above styled and entitled cause, and sues the defendant, Louisville & Nashville Railroad Company, which has been duly summoned herein, and for cause of action says:

1st. For that whereas, heretofore, to-wit:—On the 27th day of February, 1908, the plaintiff was the owner and in possession of a certain raft of pine timber, which at said time, was rafted and lying in the waters of the Apalachicola River at and near bridge of the defendant company across said river; and while said raft was so lying at or near such bridge in the river aforesaid the said defendant, by and through its servants, agents and employees, entered upon said raft, and over and against the protest of the plaintiff, cut the binders of said raft

and the rope to said raft attached and turned said timber loose in the waters of said river, whereby a large portion of said logs, to-wit :—sixty-four pine logs, of great value, to-wit, of the value of Five Hundred ($500.00) Dollars, were washed and carried away and were never found or recovered by plaintiff, but were wholly lost; that by reason of the unlawful acts of said defendant, in so cutting and turning loose said raft of timber, plaintiff was forced to expend large sums of money for labor and salvage for the recovery of a portion of the logs so cut adrift as aforesaid by the said defendant, to-wit, the sum of Fifty ($50.00) Dollars.

Wherefore, plaintiff sues and alleges his damages by reason of the premises in the sum of Seven Hundred and Fifty ($750.00) Dollars.

2nd.—Plaintiff further sues the defendants, for that whereas, heretofore, to-wit—, on the 27th day of February, 1908, plaintiff was the owner and in possession of a certain raft of pine timber which was then and there in the waters of the Apalachicola River; that while floating said raft of timber down said river the rear block of the said raft became fastened to a certain plank enclosure enclosing and surrounding one of the piers of the bridge belonging to the defendant company; that plaintiff was using all reasonable means in his power to remove said logs and unfasten the same, but that while plaintiff was so endeavoring to unfasten said logs so that he might proceed to market therewith, the said defendant, without reasonable cause or grounds therefor came upon said logs by its agents, servants or employees and over the protest of plaintiff proceeded to cut the binders which held said logs together, and also the ropes attached to said raft, and turned said timber loose; that by reason of the actions of the defendant, as aforesaid, said raft became broken up and the logs thereof drifted away, and

a large part thereof, to-wit, sixty-four pine logs of the average of four hundred feet each, and of great value to-wit, the value of $500.00, were never found or recovered by plaintiff, but, on the contrary, were wholly lost; that by reason of the unlawful acts of the defendant in so cutting and turning loose said raft of timber, in addition to the loss of timber aforesaid, plaintiff was forced to expend large sums of money for labor and salvage in finding and recovering a portion of said logs which were formerly a part of said raft, to-wit, the sum of Fifty Dollars.

Wherefore, the plaintiff sues and alleges his damages, by reason of the premises, in the sum of Seven Hundred and Fifty Dollars.

Bill of Particulars hereto attached, marked Exhibit 'A' and asked to be taken and considered a part of this declaration.

And plaintiff claims damages in the sum of Seven Hundred Fifty ($750.00) Dollars.

Will H. Price,

3-26-'08.                    Attorney for the Plaintiff.

### BILL OF PARTICULARS.

Louisville & Nashville Railroad Company,

In Acct. With,

W. G. Yarbrough—

To 64 pine logs, 400 feet average each.....$500.00
To money and labor expended in recovering
    a portion of the original logs.......... 50.00

Total.........................$550.00

A plea of not guilty was filed, and on the trial the plaintiff recovered a judgment for $473.30 damages, and

$45.60 costs. The judgment is here for review on writ of error.

The facts we deem it necessary to refer to briefly stated are about as follows: Sometime in · February, 1908, the plaintiff hired a man named Sheppard Royals to drive a raft of logs belonging to the former down the Apalachicola (Chattahoochee) River to Apalachicola, past the point where the railroad bridge of the defendant spans the river. There were ninety logs in the raft, fastened together in sections. In the first section there were twenty pine logs; in the second twenty-one; in the third eighteen; in the fourth nineteen, and the balance were put into what the witnesses call a spantail, in the center of the raft. These sections were fastened together by couplings and binders. There was also a rope running from the bow to the stern to aid in holding the raft together. The raft was started down the river about two o'clock in the afternoon. The river was high, and between eight and ten o'clock at night it reached the bridge of the defendant corporation. The river is a navigable stream, and there is a drawbridge to permit the passage of steamboats. On either side of the pier on which the draw rests there is a navigable channel sufficiently wide to easily permit the passage of boats and rafts. In going under the drawbridge the driver of the raft Sheppard Royals so managed that the rear end of the raft struck against the fender which protected the pier and forced by the current doubled around the pier and thus the raft was hung up against the fender of the bridge where it remained all night. Early the next morning it was discovered by the agent of the railroad in charge of the bridge. Sheppard Royals had two men to assist him in driving the raft, but after it lodged against the fender of the pier one of them quit work entirely, as it was cold, and the other does not seem to have been efficient. It

does not appear that Royals had any apparatus whatever to deal with emergencies of this kind, nor does it appear that he made any effort whatever to provide apparatus, or to secure help, except in so far as it was furnished by the railroad company. He says if he had been given time he could have dislodged the raft, but he does not say how much time he proposed to take, nor how he proposed to do it. The railroad employes got together eight or ten men, a two inch rope, a block and tackle, and seemed to have done everything in their power to pull the raft away from the fender. Having pulled in vain and broken the ropes about three o'clock in the afternoon, Mr. Duncan, the Superintendent of Bridges, ordered the raft to be broken up so that the fender could be relieved. Mr. Wright, the bridge foreman, testifies that the river was rising and the raft was causing a jam in the river and endangering the bridge. The fastenings and binders of the raft together with the rope were cut loose and all the logs floated off except eleven. The plaintiff afterwards recovered twenty-five of those that floated off, and testifies it cost him $50.00 to recover these logs. After the couplings and fastenings of the logs were cut, the raft still clung to the fender because of the rope which was tied in both bow and stern and stretched from one to the other. It seems this rope was tight against the fender and held the raft to it. Sheppard Royals says he asked the "gentlemen of the railroad not to cut this line until he could untie it." He does not say how long it would have taken him to do it. He simply asked for time to do it. The railroad men did not give time but cut the line. Royals says that if the line had not been cut as it was he could have saved part of the raft by tying it to the bank with the rope. There is no plea of contributory negligence on the part of the plaintiff either in the equipment or management of the raft, or in getting it loose

from the fender, or in saving the logs after the raft was broken up.

It is held in this State that a raft should be navigated with ordinary care, diligence and skill so as to prevent injury to the rights of others. It is also settled that the floatage of logs must be with due and reasonable regard to the rights of a bridge owner. Bucki v. Cone, 25 Fla. 1, 6 South. Rep. 160; Sullivan v. Jernigan, 21 Fla. 264. The right to run logs in navigable waters must be exercised with due and reasonable care and diligence and due regard to the rights of others, and to the general usages and customs of navigation and commerce. 1 Farnham on Waters and Water Courses, pp. 158, 159.

It was decided in the case of Pensacola & A. R. Co. v. Hyer, 32 Fla. 539, 14 South. Rep. 381, that a railroad is not required to keep the open space under its drawbridges over a navigable stream free from obstructions to navigation when such obstructions are present without fault on the part of the railroad. We are of opinion, however, that it is the duty of a railroad company to prevent the accumulation of wreckage or drift around the piers of its bridges which would interfere with navigation. St. Louis, I. M. & S. Ry. v. Meese, 44 Ark. 414.

Something more than an ordinary obstruction of navigation is involved in this case. The raft being lodged against the fender of the pier of the drawbridge, the water being high, and likely to cause a jam of drift, thereby endangering the bridge itself, was a menace to the defendant's property, and a nuisance, which the defendant had the right to remove for its own protection and the protection of the lives and property of those who had occasion to use the railroad. In removing the raft it was its duty to use ordinary care to do no unnecessary injury to the owner of the raft. Mark v. Hudson River Bridge Co., 103 N. Y. 28, 8 N. E. Rep. 243; Beach v.

Schoff, 28 Pa. St. 195; I Wood on Nuisances (3rd ed.) § 17, 71; Joyce on Law of Nuisances, § 1, 2, 368; Graves v. Shattuck, 35 N. H. 257, 69 Am. Dec. 536 and note p. 545.

One of the assignments of error is based on the following part of the judge's charge to the jury: "A duty would also devolve upon the railroad company owning the bridge, in the first instance, to wait a reasonable time for the owner of the raft or his agents, to remove the raft, and after the time expired, to use, that is the bridge owner, to use all proper and necessary efforts to remove the raft without breaking it up or cutting it.   If it proved impossible to remove it from the position it occupied, without breaking it, or cutting it, then the railroad company or owner of the bridge, would have the right to cut the raft in such manner as to injure it as little as possible under the circumstances, and to expose it to as little risk or loss as possible under the circumstances, and there would also be a duty upon the bridge owner, before they so broke up or cut the raft, to notify the owner or agents of their intention so to do, and allow him reasonable time and opportunity to prepare to take care of the raft after it was cut loose, and it would be the corresponding duty of the raft owner, through his agents, to take prompt and effective measures to protect the property after it was turned loose by the owner of the bridge, and there would be no special duty on the owner of the bridge to look out for the property after it was cut loose, provided the manner and time of cutting loose the raft and the means by which it was effected, was such as an ordinarily prudent and cautious person would have used under the circumstances."

If this had been a case simply of an obstruction of a navigable stream, the charge would perhaps have been unobjectionable.   But we are of opinion that the real

question was otherwise. Not only the railroad company but the public were interested that no harm or damage should be done to the bridge. This bridge is a part of the line of one of the most important railroads in the State connecting the Eastern and Western portions thereof. Many passenger and freight trains are daily passing over it. The river was high and rising. A serious injury to the bridge might have caused not only loss of property and inconvenience to the public, but the loss of life. We think therefore that portion of the charge imposing 'the duty upon the railroad before it broke up the raft to notify the owner or his agents of their intention so to do, and to allow him a reasonable time and opportunity to take care of the raft after it was turned loose," was inappropriate to the facts of this case. The reasonable time for preparation for caring for the raft might have involved many hours, if not days of delay and in the meantime brought disaster upon the bridge. 1 Farnham on Waters and Water Rights, p. 441. Joyce Law of Nuisances, § 374.

The raft struck the fender of the bridge about nine o'clock at night and became wrapped around the fender where it seems to have been held tight by the current. It was not cut loose until after three o'clock in the afternoon of the next day. The plaintiff's agent should have recognized the gravity of the situation and have exerted himself to procure aid and facilities for relieving it. He seems to have practically done nothing. He had the whole morning and until three o'clock in the afternoon to notify his principal and secure aid and facilities. He offers no explanation why he did not adopt and carry out with energy some plan which could have made it unnecessary for the defendant's agents to cut up the raft. Under the circumstances we do not see why the owner or his agent should have had any other notice than they had

of the exigencies of the situation.    1 Am. & Eng. Ency. Law (2nd ed.) 79 to 86 inclusive.

There are several assignments based on rulings of the court in refusing to allow the defendant to propound questions to witnesses in regard to complaints made by the Captain of the Steamer Callahan of the obstruction to navigation by the lodgment of the raft against the fender of the pier.    We do not think the court erred.  The Steamer actually passed up the river and the testimony if elicited would have been hearsay.    Moreover it was actually proven by one of the witnesses that the officers of the boat complained of the obstruction.

We deem it proper to remark in order to prevent any misunderstanding that no question is presented to us by the pleadings or argument of the applicability to the facts of this case of section 3149 of the General Statutes of 1906.    If that section does not apply then the doctrine of contributory negligence on the part of the plaintiff, as announced in the case of Louisville & Nashville R. Co. v. Yniestra, 21 Fla. 700, and other decisions of this court might be applicable.    If the section does not apply the facts of the case as shown in the testimony would, *at the least*, in our opinion, require a proper apportionment of the damages between the plaintiff and defendant.

The judgment of the Circuit Court is reversed.

TAYLOR and PARKHILL, JJ., concur.

WHITFIELD, C. J., and SHACKLEFORD and COCKRELL, JJ., concur in the opinion.